**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **HARPER COTÉ,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **PANASONIC ENERGY CORPORATION** | ) | Case No. |
| **OF NORTH AMERICA, d/b/a PANASONIC** | ) | |
| **NORTH AMERICA** | ) | **JURY TRIAL DEMANDED** |
| 25501 W. Valley Parkway | ) | Designation of Trial: Kansas City |
| Olathe, KS 66061 | ) | |
| (Serve: Corporation Service Company | ) | |
| 1100 SW Wanamaker Road, Suite 103 | ) | |
| Topeka, KS 66604), | ) | |
| | ) | |
| Defendant. | ) | |

<u>**COMPLAINT**</u>

Plaintiff states the following as her causes of action against Defendant Panasonic Energy Corporation of North America, d/b/a Panasonic North America.

<u>**PARTIES**</u>

1.      Plaintiff Harper Coté (Plaintiff) is a Caucasian female resident of Kansas City, Jackson County, Missouri.

2.      Defendant Panasonic Energy Corporation of North America d/b/a Panasonic North America (Defendant) is a foreign corporation organized and existing under the laws of Delaware that conducts business in the State of Kansas at the address set forth above.

3.      At all times relevant herein, Defendant was Plaintiff's employer and Defendant employed more than 50 employees for each working day in each of 20 or more calendar weeks, making Defendant an employer as defined by 42 U.S.C. § 2000e(b).

4.     At all times relevant hereto, Plaintiff was an employee of Defendant, as that term is defined in 42 U.S.C. §2000e(f). At all times relevant hereto, Defendant had more than 500 employees.

## JURISDICTION AND VENUE

5.     This action arises under the laws of the United States, to wit: Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq.

6.     Jurisdiction exists over this matter pursuant to 28 U.S.C. §§ 1331 and 1332 because Plaintiff's claims are brought under federal law and because Plaintiff and Defendant are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

8.     On or about July 9, 2025, Plaintiff timely filed a Charge of Discrimination, alleging that Defendant discriminated against her on the basis of her gender and that Defendant subjected Plaintiff to sexual harassment.

9.     On or about October 16, 2025, Plaintiff filed an Amended Charge of Discrimination alleging retaliation and constructive discharge that occurred after Plaintiff filed her initial Charge of Discrimination.

10.     The acts that give rise to this cause of action all occurred within 300 days of Plaintiff's filing of her Charge of Discrimination and Amended Charge of Discrimination.

11.     On January 7, 2026, Plaintiff received a Notice of Right to Sue from the Equal Employment Opportunity Commission (EEOC) and this suit has been filed within 90 days of receipt of the Notice of Right to Sue.

12. Plaintiff has fulfilled all conditions precedent to the bringing of this claim and has duly exhausted all administrative procedures in accordance with the law prior to instituting this lawsuit.

## ALLEGATIONS COMMON TO ALL COUNTS

13. Plaintiff applied for a Machine Operator Level 3 position with Defendant.

14. During the interview process, Defendant steered Plaintiff into the Apprenticeship Program, representing that it would provide a faster path to a supervisory position.

15. On January 15, 2025, Defendant sent Plaintiff a letter offering her the position of "Position Skilled Machine Technician Apprentice" (PENCA) in Manufacturing.

16. On March 17, 2025, Plaintiff began working for Defendant.

17. The Apprenticeship Program consisted of seven weeks of classroom training at Kansas City Kansas Community College, followed by additional training at Defendant's Cedar Creek office complex while the plant facility in DeSoto, Kansas was under construction.

18. At the time Plaintiff began her employment with Defendant, Plaintiff was simultaneously pursuing her Bachelor's Degree in Management from Tiffin University through an online program.

### Sexual Harassment by Andrew Cole

19. Approximately three weeks into the classroom training portion of Plaintiff's employment, Plaintiff walked past coworker Andrew Cole (Cole), who was eating takeout from Taco Bell.

20. As Plaintiff passed Cole, he said to Plaintiff, "Harper, I'd like to eat your taco."

21. Other students were present when Cole made this sexually explicit comment to Plaintiff.

22.     Several weeks later, despite being assigned to a different lab group than Plaintiff, Cole entered Plaintiff's lab class and sat next to her.

23.     Cole moved in close and began reaching into Plaintiff's space and touching her hand and arm.

24.     Cole later aimed his phone at Plaintiff and proceeded to place it in his lap.

25.     It appeared to Plaintiff that Cole was taking photos or videos of her without her consent.

26.     On May 5, 2025, Plaintiff reported Cole's harassment to Alexis Eberth (Eberth), Senior Manager of Apprenticeships.

27.     That same day, May 5, 2025, Eberth responded by emailing Plaintiff and telling her in part to "[p]lease keep engaging, asking questions, and working with instructors and other classmates" and then asked Plaintiff whether there is "anything specific I can do to mitigate this situation?"

28.     On May 8, 2025, Plaintiff's teacher, Michael Reynolds, also reported Cole's harassment of Plaintiff to Eberth.

29.     It was only then that Eberth emailed Plaintiff on May 8, 2025, to inform Plaintiff that Eberth would be contacting HR regarding Coles' harassment of Plaintiff.

30.     Compliance and Investigations Manager Len Salcedo from Defendant's California office conducted an investigation over the phone and interviewed witnesses via Zoom.

31.     Rather than place Cole on administrative leave during the investigation, Cole remained employed and continued to harass Plaintiff for approximately six additional weeks.

32.     During this time, Cole would wait outside the bathroom for Plaintiff, sit in conference rooms staring at Plaintiff, and engage in other intimidating behavior.

33.     Cole would also park his car next to Plaintiff's vehicle and point his phone at her, again as if he were taking photos or videos of her.

34.     Plaintiff's classmate Todor Sarenac (Sarenac) repeatedly had to intervene by closing doors to prevent Cole from watching Plaintiff.

35.     When Plaintiff reported Cole's continued presence and harassment to supervisor Brian Simms (Simms), Simms told Plaintiff he would make sure it got handled.

36.     When Plaintiff reported the behavior to supervisor Michael Chavarria (Chavarria), Chavarria told Plaintiff that management was watching to see who performs better" as between Plaintiff and Cole.

37.     Salcedo finished his investigation on May 28, 2025, and completed his report on June 5, 2025.

38.     However, it was not until June 17, 2025, that Plaintiff received an email from Salcedo stating that all three of Plaintiff's complaints against Cole had been substantiated: the inappropriate sexual comment, Cole following Plaintiff and placing his hands on her mid-back, and Cole's use of racial slurs in front of other employees.

39.     When Defendant finally terminated Cole, Chavarria pulled Plaintiff aside to inform her that she had "outperformed" Cole in test scores, implying that Cole's termination was based on his performance rather than his substantiated sexual harassment.

**Sexual Harassment by Brian Simms**

40.     On or about May 12, 2025, Simms, became Plaintiff's Production Supervisor over the Mix Department on what would later be designated D-shift (Wednesday through Saturday).

41.     During the second week of his supervision, Simms touched Plaintiff by rubbing his hand back and forth between her shoulder blades while he called her "Honey."

42. Plaintiff immediately corrected Simms by asking him not to touch her and to either call her Harper or Miss Coté.

43. In response, Simms asked if Plaintiff was serious, and Plaintiff told him "Yes, you can ask Corti [Cordi] Pascal."

44. This incident occurred in a training area known as a "Dojo" in the presence of Cody Oberheim (Oberheim) and Cordi Pascal, as well as two other employees.

45. That day after class, Simms pulled Plaintiff aside and told her that he knew Plaintiff was going to be a problem from the moment he saw her, telling Plaintiff that she was "too attractive" to be working in manufacturing.

46. It is Plaintiff's understanding that Simms told Plaintiff's coworker Jackie Barcomb (Barcomb) that he would rather have men on his team than beautiful women, i.e. Barcomb and Plaintiff.

47. On yet another occasion, Simms told both Plaintiff and Barcomb that he would rather have men on his team than beautiful women.

48. Plaintiff responded by telling Simms that she was a good employee and needed the opportunity to get to the plant and show her skills.

49. After Plaintiff requested Simms call her Harper or Miss Coté, Simms began mocking Plaintiff when addressing her by calling her "Miiissss Coté," drawing out the word Miss.

50. Within a week or two, Plaintiff was leaving for lunch, and Simms was sitting across from Plaintiff facing her.

51. When Plaintiff removed her blazer, Simms said, "Damn. Harper, put those away," extending his palms out to indicate he was referring to Plaintiff's breasts.

52. This comment was made in front of several of Plaintiff's coworkers.

53.    Plaintiff approached Simms privately and asked him to stop making comments like that in front of others because she was concerned it would affect the way coworkers viewed and interacted with her.

54.    Plaintiff also told Simms that he is a leader and needs to lead by example.

55.    Despite Plaintiff's request, approximately one week later when Plaintiff simply stood up from her seat, Simms again held his palms out at Plaintiff and said "woah," again referencing Plaintiff's breasts.

56.    A few days later, Plaintiff yawned in class because she had stayed up late doing schoolwork for her bachelor's degree program.

57.    When Simms saw this, he asked Plaintiff why she was yawning and asked Plaintiff if was tired from working all night at the strip club.

58.    Plaintiff responded and told Simms "No" and explained that she was up late studying.

59.    Simms continued to question Plaintiff about working late at night as a stripper, including asking Plaintiff if he was going to walk into the club one night and see her naked shaking her thing for dollars.

60.    This stripper comment was made in the presence of Sarenac, who was sitting next to Plaintiff.

61.    On or about June 11, 2025, Plaintiff's birthday, Plaintiff had another incident with Simms where Simms made comments about Plaintiff being "unknowledgeable" in the presence of several of Plaintiff's coworkers.

62.     Simms went on to berate Plaintiff by saying that he has a special job just for her that would be so hard that she would be crying, pulling her hair out, and wanting to quit by the end, and then Simms laughed at Plaintiff.

63.     After this threat, Plaintiff was visibly upset and escorted to HR where she spoke to HR Representative, Jerry Wallace (Wallace).

64.     Plaintiff reported to Wallace the harassment and threat Simms had just made to her in the classroom, and she explained the ongoing harassment she had been receiving from Simms, including telling him about the incidents leading up to that day, i.e. the touching incident, the "honey" comment, the comment about attractive women being a distraction, the comments about Plaintiff's breasts, and the stripper comment.

65.     Wallace then contacted Employee Relations Manager Dominique Campbell, and Campbell then escorted Plaintiff to a room with Campbell where Plaintiff gave another statement regarding the ongoing harassment by Simms, including reporting to Campbell what had happened that day.

66.     Campbell requested Plaintiff stay late to make a written statement.

67.     Since it was Plaintiff's birthday and since she had plans to meet a group of friends and coworkers that evening, Plaintiff asked Campbell if she could finish her written statement later.

68.     On or around June 12, 2025, Plaintiff emailed Campbell her written statement.

69.     On June 14, 2025, Defendant placed Simms on paid administrative leave while Defendant conducted an investigation.

70.     Despite Campbell telling Simms that her report of Simms would be kept private, it is Plaintiff's understanding that Simms told employees at Cedar Creek, including Barcomb, that

Plaintiff was out to get him and that Plaintiff was asking for it. Simms made these comments while Plaintiff was at the plant and before Defendant placed Simms on paid leave.

71. While on leave, Simms' name and photo were removed from the employee board at the facility.

72. During the investigation, Plaintiff heard from witnesses, including Sarenac and Barcomb, that Campbell questioned the witnesses about Plaintiff's birthday outing but did not ask about the events that Plaintiff had reported had taken place at Cedar Creek regarding Simms.

73. Before Defendant informed Plaintiff that Simms would be returning to work as her supervisor, Apprentice Victoria Mays informed Plaintiff that she had been tasked with putting Simms' name and photo back on the board because he would be returning as Plaintiff's supervisor.

74. On July 2, 2025, Plaintiff received an email from Campbell stating:

> 1. You raised a concern that you were touched inappropriately. In our inquiry, this was unsubstantiated.
> 2. You raised a concern that inappropriate comments of a sexual nature were directed at you. In our inquiry, the comments were substantiated but the sexual nature was not.
> 3. You raised a concern that you were the subject of degrading and embarrassing comments in front of (and away from) your peers. In our inquiry, the comments were substantiated but that the intent was to degrade or embarrass you was not.

75. That same day, July 2, 2025, Plaintiff asked Dan Lange (Lange), Defendant's HR Operations Director, to have someone else besides Campbell investigate Plaintiff's reports regarding Simms because it appeared that Campbell and Simms were friends and that the behavior Simms was getting away with was disgusting.

76. Lange denied Plaintiff's request, stating that everyone was aware of the situation and that it had been investigated appropriately.

9

77.     Following Lange's denial to Plaintiff, Plaintiff reached out to Alan Swan (Swan), President of Panasonic Energy of North America, and to Innocent Chikunya (Chikunya), the Vice President of Operations.

78.     Lange responded to Plaintiff stating that Swan and Chikunya were aware of the situation and believed everything had been handled appropriately and that the investigation had been done above board.

79.     On July 7, 2025, Defendant issued Simms a document titled, "Memorandum," with the subject "Expectations of Performance" confirming that Defendant's investigation substantiated that Simms "used inappropriate and unprofessional language when addressing individuals under [his] supervision, including referring to individuals as 'honey' and 'beautiful.'"

### Additional Harassment and Retaliation

80.     On July 9, 2025, Simms returned from his paid leave.

81.     After his return to work, Simms continued to be Plaintiff's supervisor, despite HR's finding that his conduct towards Plaintiff was inappropriate.

82.     Simms then began telling other employees, including Ronald Moore and Neville Anderson, that Plaintiff had "asked for it" and/or that Plaintiff was out to get him.

83.     Plaintiff discovered that Simms had made similar comments to another female employee, Leandra Olivia, who worked on the same shift.

84.     On July 10, 2025, Plaintiff reported to Lange that Simms was spreading rumors and untrue statements about her reports of sexual harassment in an attempt to slander Plaintiff's name.

85.     On or about July 11, 2025, Plaintiff met with Campbell regarding her July 10, 2025, email to Lange.

86.    During the meeting, Plaintiff reported that she was almost immediately tasked by Simms and Supervisor Braden Lorenz with having to do the daily Safety, Quality, Cost, Delivery, People (SQCDP) board to track shift progress.

87.    Plaintiff reported to Campbell that this work assignment and having to work one-on-one with Simms caused her distress.

88.    On July 11, 2025, Lange asked Plaintiff if she wanted to change shifts. Elizabeth Dougherty (Dougherty), another HR Manager, was present for this conversation.

89.    Plaintiff declined to move, explaining that D-shift aligned with her college schedule and that she should not be punished by having to move shifts because Simms was the harasser, not her.

90.    On the same day, July 11, 2025, Plaintiff declined to change shifts, Lange emailed Plaintiff and told her she being moved to move to B-shift (Monday through Wednesday) anyway.

91.    The forced shift change to B-shift created a conflict with Plaintiff's college class schedule.

92.    Plaintiff reached out to other departments and to Lange to try and move departments to remove herself from Simms.

93.    Lange never directly responded to Plaintiff's request to be moved to a different department.

94.    On or around July 11, 2025, Plaintiff reached out to Plant Manager Rodaldo Rodriguez and Troy Schatz, a supervisor in the Press/SB Department and asked if they had a position for both her and Barcomb.

95.    A different Plant Manager named Simon Jouan (Jouan) sent Plaintiff a Teams message and asked Plaintiff to meet him at his temporary office.

11

96.    Jouan told Plaintiff that HR had done their job, and now Plaintiff needed to do her job.

97.    Jouan also told Plaintiff that she does not work in HR, she needed to trust that that HR did the right thing, that she was not allowed to move departments, and that she needed to get back to work.

98.    As a direct result of being forced to change shifts, Plaintiff had to drop out of her bachelor's degree program at Tiffin University, which caused Plaintiff to lose her Pell Grant eligibility and delayed Plaintiff's educational and career advancement goals.

99.    Plant Manager David Young (Young) was not informed about the sexual harassment issues with Simms because he had been in Reno, Nevada for training during the relevant time period.

100.    When Young returned and learned about Simms' harassment of Plaintiff, he immediately took action.

101.    Young told Plaintiff's co-workers that Simms would be removed and that Plaintiff could return to D-shift.

102.    Young sent Plaintiff an email instructing her to take a day off and then return to D-shift.

103.    Plaintiff complied with Young's request.

104.    Lange and Dougherty then pulled Plaintiff into a meeting and told her that Young did not have authority to make that decision and that HR had instructed Young that Plaintiff could not return to D-shift.

12

105. After Plaintiff protested and explained the hardship of B-shift and noted that Simms was being moved to the Assembly Department (out of electrode entirely), HR relented and allowed Plaintiff to remain on D-shift.

106. Upon information and belief, Young was reprimanded by HR for allowing Plaintiff to return to D-shift.

107. After being moved to the Assembly Department, Simms sought out Plaintiff's new supervisor, Brandon Delgado (Delgado), who had transferred from Defendant's Reno, Nevada facility, and had a one-on-one conversation with him about Plaintiff and "the Brian situation," despite directives not to discuss Plaintiff's harassment complaint and the resulting investigation.

108. Simms' gossip about Plaintiff to other supervisors caused co-workers to avoid Plaintiff, exacerbating the hostile work environment and damaged Plaintiff's reputation and working relationships.

109. Further, Plaintiff was excluded from advancement opportunities in the apprenticeship program.

110. Although Defendant initially represented that the apprenticeship program would be a faster path to supervisory positions, Plaintiff was later informed that apprentices must complete one year as an apprentice, then a year as a Skilled Machine Operator 3, then a year as a Skilled Machine Operator 4, then another year as a lead before being eligible for a supervisor position— a four-year timeline.

111. However, during the last day of Plaintiff's apprenticeship classroom training, three apprentices from the cohort immediately preceding Plaintiff's class came to speak to Plaintiff's class.

13

112.    One female apprentice from the assembly department stated she had already been made a supervisor despite having been an apprentice only two months earlier.

113.    The other two former apprentices stated they were already in lead positions.

114.    Plaintiff brought this discrepancy to Eberth's attention, on July 21, 2025, Eberth stated that she could not be of assistance to Plaintiff unless Plaintiff could provide the names of these three apprentices.

115.    Despite Plaintiff's efforts to obtain the names through teachers and classmates, Defendant failed to provide the information necessary for Plaintiff to pursue this complaint.

116.    Upon information and belief, Defendant discontinued its practice of promoting apprentices to lead and supervisory positions within months of completing the program after Plaintiff reported sexual harassment by Simms.

### Additional Harassment, Retaliation, and Constructive Discharge

117.    On July 31, 2025, Campbell emailed Plaintiff to inform her that Defendant had completed its investigation.

118.    Campbell informed Plaintiff that Plaintiff's report that Simms was spreading rumors and her report of retaliation were both unsubstantiated.

119.    On August 4, 2025, Simms returned to work.

120.    Following Plaintiff's complaints of sexual harassment and the inadequate response from HR, Plaintiff began experiencing emotional distress.

121.    Plaintiff experienced daily nausea and vomiting before and during work.

122.    Plaintiff's weight dropped from 171 pounds to 124 pounds during her employment with Defendant.

123. On days Plaintiff was required to report to the plant for tours before it was fully operational, Sarenac would drive Plaintiff in his truck and would have to pull over to allow Plaintiff to vomit on the side of the road.

124. Plaintiff experienced anxiety, panic, sweating, and fear related to going to work, encountering Simms, and the hostile work environment created by Defendant's inadequate response to her complaints.

125. On Plaintiff's days off, she would sleep excessively, and on nights before she had to work, she was unable to sleep at all due to anxiety.

126. Plaintiff's 19-year-old daughter witnessed Plaintiff coming home every day and running to the toilet to vomit and repeatedly urged Plaintiff to quit her job due to concern for Plaintiff's health and wellbeing.

127. The stress of the harassment and hostile work environment caused Plaintiff to intentionally fail a test on one occasion to avoid having to go to the plant with Simms.

128. Defendant made Plaintiff retake the test.

129. On one occasion when Plaintiff had to tour the plant while it was still under construction — with no power, plastic sheeting, holes in walls, missing guardrails on stairwells, and inadequate lighting — Plaintiff felt unsafe being in that environment with Simms given Defendant's failure to protect her from his harassment.

130. In September 2025, Plaintiff learned that she was being placed under the supervision of Chad Jennings (Jennings).

131. Jennings served as a supervisor when Plaintiff's actual supervisor, Delgado, was working nights.

15

132. Plaintiff learned from coworker Eli Scott, a fellow apprentice, that Jennings had been a sheriff for Johnson County and had been accused of raping a woman.

133. According to well publicized news reports, in approximately May of 2020, Jennings raped and sodomized an engaged woman at a bonfire gathering while Jennings was married.

134. In June of 2021, charges of rape and aggravated sodomy were brought against Jennings.

135. As a result of these allegations, Jennings lost his law enforcement certification and could no longer serve as a police officer.

136. On September 14, 2025, in a meeting in a storage room with Delgado, Plaintiff, Barcomb, and Jennings, Plaintiff expressed frustration about difficulty working with lead worker Michael McCray (McCray) because McCray's girlfriend, who worked in the administration department had told him that she was uncomfortable with McCray working with Plaintiff due to "the Brian situation."

137. Delgado told Plaintiff, "I'm aware of the Brian situation. He actually pulled me aside when I first got here and explained to me all about you."

138. This statement shocked Plaintiff because when Simms was brought back to work, all of the employees were told they were not allowed to discuss the harassment complaints and had to remain 100% professional.

139. On or about September 18, 2025, Plaintiff reported what she had learned about Jennings to Chavarria to find out if Defendant was aware of the criminal charges brought against Jennings.

140. Chavarria told Plaintiff that Defendant was aware of Jennings' past, including the sexual assault charges.

141. The assignment of Plaintiff to work under the supervision of Jennings, known to have been accused of rape, after Defendant had failed to promptly and adequately address the harassment by Cole and Simms, caused Plaintiff to believe that the work environment was not safe and would not be free from sexual harassment.

142. The combination of the ongoing retaliation, the hostile work environment, Defendant's failure to discipline Simms despite substantiated inappropriate conduct, the damage to Plaintiff's professional reputation, the interference with her educational goals, her severe physical and mental health symptoms, and the assignment to work under an alleged sexual assaulter made Plaintiff's working conditions so intolerable that she felt she had no choice but to resign.

143. Plaintiff informed Jennings and Young that she was leaving because of Simms' continued harassment and the continued hostile environment from others.

144. On September 18, 2025, Plaintiff sent a text message to Young stating: "I've continued to deal with Brian's prolonged harassment."

145. On September 18, 2025, Plaintiff resigned her employment with Defendant.

146. Plaintiff's resignation was a constructive discharge because Defendant created working conditions so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign.

147. Plaintiff made numerous complaints of sexual harassment and retaliation to Defendant through multiple channels, including supervisors, HR, and upper management.

148. After receiving Plaintiff's complaints, Defendant failed to conduct adequate investigations, failed to properly interview witnesses about the actual incidents complained of, failed to take appropriate corrective action, and allowed the harassment and retaliation to continue.

17

149. Defendant knew or should have known of the sexual harassment against Plaintiff and the retaliation against Plaintiff for complaining about sexual harassment, and despite this knowledge, failed to take prompt and appropriate corrective action.

150. As a result of Defendant's actions and failures to act, Plaintiff has suffered damages including lost income, lost benefits, loss of educational opportunities, damage to her personal and professional reputation, severe emotional distress, and other damages yet to be determined.

151. Plaintiff continues to suffer from the effects of Defendant's discrimination, harassment, and retaliation.

**COUNT I**
**SEX/GENDER DISCRIMINATION AND HOSTILE WORK ENVIRONMENT**

152. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

153. Defendant's actions as set forth above constitute discrimination against Plaintiff on the basis of Plaintiff's sex or gender, female.

154. Plaintiff was subjected to severe and pervasive sexual harassment by coworker Cole and supervisor Simms based on her sex.

155. The harassment included unwelcome sexual comments, unwelcome physical touching, sexually suggestive remarks about Plaintiff's body, comments about stripping and sexualized behavior, and other conduct of a sexual nature.

156. The harassment was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment by creating an intimidating, abusive and hostile work environment and/or unreasonably interfering with Plaintiff's ability to do her job.

157.    Defendant knew or should have known of the discrimination and sexual harassment against Plaintiff, based on Plaintiff's sex or gender and, despite Plaintiff's complaints, failed to investigate these complaints adequately or implement prompt and appropriate corrective action.

158.    Through the actions set forth in the foregoing paragraphs, Defendant intentionally discriminated against Plaintiff based on Plaintiff's sex or gender in violation of Title VII.

159.    Defendant maintained inadequate written policies, procedures, or guidelines with respect to sexual harassment and retaliation for reports of discrimination based on Plaintiff's gender.

160.    As a result of the above-mentioned discrimination, Plaintiff was damaged, and is entitled to all remedies available to her as provided by Title VII. Such remedies include, but are not limited to, damages for loss of income, embarrassment, humiliation, emotional distress, damage to her reputation, diminution in earnings capacity, and other damages yet undetermined, and Plaintiff is reasonably expected to suffer from such damages in the future. Plaintiff also is entitled to reinstatement and/or front pay.

161.    Defendant's conduct constitutes intentional discrimination on the basis of Plaintiff's sex or gender with malice, and/or reckless disregard of Plaintiff's known rights.

162.    Defendant's conduct was outrageous because of Defendant's evil motive or reckless indifference to the rights of Plaintiff, thereby entitling Plaintiff to punitive damages in an amount that will punish Defendant and will deter Defendant and others from like conduct.

163.    Plaintiff is entitled to attorney's fees.

**WHEREFORE**, Plaintiff prays for judgment against Defendant on Count I in an amount that is fair and reasonable, for actual and compensatory damages, punitive damages, for

reinstatement or front pay, for her costs and attorneys' fees, and for such other equitable relief as this Court deems just and proper.

## COUNT II
## RETALIATION

164. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

165. Plaintiff made internal complaints of sexual harassment and gender discrimination as set forth above to supervisors, HR personnel, and upper management.

166. Plaintiff also filed a Charge of Discrimination with the EEOC on July 9, 2025, and Amended Charge of Discrimination with the EEOC on October 16, 2025.

167. Following Plaintiff's complaints of sexual harassment and discrimination, Plaintiff was subjected to retaliation, including being forced to change shifts against her will, being required to drop out of college as a result of the shift change, having her harasser spread rumors and gossip about her to supervisors and coworkers, being denied advancement opportunities in the apprenticeship program, and being subjected to a continued hostile work environment.

168. Defendant's abrupt and forced change of Plaintiff's shift, despite Plaintiff's objection and explanation of the educational hardship it would cause, was done in retaliation for Plaintiff's complaints of sexual harassment.

169. The shift change directly caused Plaintiff to lose educational opportunities and delay her career advancement.

170. Defendant failed to prevent Simms from discussing Plaintiff's harassment complaint with other supervisors, allowing him to damage her professional reputation and working relationships in retaliation for her complaints.

20

171. Defendant failed to conduct any meaningful investigation of Plaintiff's complaints of sexual harassment, asked witnesses irrelevant questions, ignored witness accounts, denied Plaintiff's request for reinvestigation, and failed to take any effective remedial action regarding Plaintiff's complaints of illegal discrimination, harassment, and retaliation.

172. Defendant's conduct constitutes intentional retaliation for Plaintiff's complaints of discrimination on the basis of gender.

173. Defendant's conduct as set forth above was taken with malice, and/or reckless disregard of Plaintiff's known rights entitling Plaintiff to punitive damages.

174. Defendant's actions as set forth above constitute an intentional pattern and practice of retaliation based on reports of discrimination and sexual harassment on the basis of Plaintiff's gender in violation of Title VII.

175. As a direct and proximate result of Defendant's unlawful acts of retaliation, Plaintiff has suffered damages, including, but not limited to, economic loss in the form of lost wages and lost benefits, future wages and lost earnings, loss of educational opportunities, damage to her professional reputation and career, as well as emotional and mental distress. Plaintiff also is entitled to reinstatement and/or front pay.

176. Plaintiff is entitled to attorney's fees.

**WHEREFORE**, Plaintiff prays for judgment against Defendant on Count II in an amount that is fair and reasonable, for actual and compensatory damages, punitive damages, for reinstatement or front pay, for her costs and attorneys' fees, and for such other equitable relief as this Court deems just and proper.

**COUNT III**
**CONSTRUCTIVE DISCHARGE**

177.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

178.    Defendant, through its agents, employees, and supervisors, created and maintained working conditions that were so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign.

179.    These intolerable conditions included subjecting Plaintiff to severe and pervasive sexual harassment by multiple employees, failing to take adequate corrective action despite substantiated findings of harassment, retaliating against Plaintiff for complaining about harassment, forcing Plaintiff to change shifts resulting in her having to drop out of college, allowing the harasser to spread damaging rumors about Plaintiff to supervisors and coworkers, denying Plaintiff advancement opportunities, and placing Plaintiff under the supervision of an individual with credible allegations of sexual assault.

180.    Defendant knew or should have known that its actions and failures to act would result in Plaintiff's resignation.

181.    Plaintiff's resignation was the direct and foreseeable result of Defendant's discriminatory and retaliatory conduct.

182.    Defendant's constructive discharge of Plaintiff constitutes unlawful discrimination and retaliation in violation of Title VII.

183.    As a direct and proximate result of Defendant's constructive discharge, Plaintiff has suffered damages, including, but not limited to, economic loss in the form of lost wages and lost benefits, future wages and lost earnings, loss of educational opportunities, damage to her professional reputation and career, as well as severe emotional and mental distress.

184.    Defendant's conduct was willful and undertaken with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

185.    Plaintiff is entitled to attorney's fees.

**WHEREFORE**, Plaintiff prays for judgment against Defendant on Count III in an amount that is fair and reasonable, for actual and compensatory damages, punitive damages, for reinstatement or front pay, for her costs and attorneys' fees, and for such other equitable relief as this Court deems just and proper.

### DESIGNATION OF PLACE OF TRIAL AND DEMAND FOR JURY TRIAL

Plaintiff designates Kansas City, Kansas as the location for trial of this matter and demands a trial by jury of all issues so triable herein.

Respectfully submitted,

**THE MEYERS LAW FIRM, LC**

By:    /s/Martin M. Meyers
　　　　Martin M. Meyers, KS Bar No. 14416
　　　　4435 Main Street, Suite 503
　　　　Kansas City, MO 64111
　　　　Ph:    (816) 444-8500
　　　　Fax:    (816) 444-8508
　　　　Email: mmeyers@meyerslaw.com

And

23

24

**EMPLOYEE & LABOR LAW GROUP
OF KANSAS CITY, LLC**

By:  /s/Kristi L. Kingston
　　　Kristi L. Kingston, KS Bar No. 19126
　　　12920 Metcalf Avenue, Suite 180
　　　Overland Park, KS 66213
　　　Ph:　(913) 286-5200
　　　Fax:　(913) 286-5201
　　　Email: kristi@elgkc.com

**ATTORNEYS FOR PLAINTIFF**

24